## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| ANGELIA ROBERTS,<br><br>     Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>     Defendant. | CASE NO. 1:20-CV-01734<br><br>DISTRICT JUDGE JOHN R. ADAMS<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**<u>REPORT AND RECOMMENDATION</u>** |

   Plaintiff Angelia Roberts ("Plaintiff" or "Ms. Roberts") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

   For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Ms. Roberts protectively filed her applications for DIB and SSI on July 17, 2018.  (Tr. 10, 210-215, 216-222.)  She asserted a disability onset date of January 25, 2012 (Tr. 10, 210, 216, 254), and alleged that she was disabled due to multiple sclerosis, torn rotator cuff in left shoulder, pacemaker, short term memory loss, seizures, heart problems, and blurred vision in left eye (Tr. 258).  Her applications were denied at the initial level (Tr. 100-101, 128-133) and upon reconsideration (Tr. 126-127, 138-149).  She requested a hearing (Tr. 150-151), which was held before an Administrative Law Judge ("ALJ") on November 5, 2019 (Tr. 38-73).

On December 26, 2019, the ALJ issued an unfavorable decision, finding that Ms. Roberts had not been under a disability within the meaning of the Social Security Act from January 25, 2012 through the date of the decision.  (Tr. 7-27.)  She requested review of the ALJ's decision by the Appeals Council.  (Tr. 207-209.)  On July 16, 2020, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II. Evidence

Although Ms. Roberts has severe physical impairments that were identified by the ALJ (*see* Tr. 12), she only challenges the ALJ's decision as to the severity of her alleged mental impairments in this appeal.  (ECF Doc. 17 pp. 1, 12-13.)  The evidence summarized herein is accordingly focused on evidence pertaining to her mental impairments and related limitations.

### A.    Personal, Educational, and Vocational Evidence

Ms. Roberts was born in 1973.  (Tr. 210.)  She was 39 years old on the alleged disability onset date, and 46 years old at the November 5, 2019 hearing.  (Tr. 39, 74.)  She lived with her father.  (Tr. 47.)  She had a high school education.  (Tr. 43, 259.)  She last worked in September

2012 as a customer service representative, having previously worked as a customer service representative and a dispatcher.  (Tr. 22, 43-51, 223, 259, 264, 1815.)

**B.**     **Medical Evidence**

    **1.**     **Treatment History**

Ms. Roberts was diagnosed with multiple sclerosis ("MS") in January 2012 after being admitted to the hospital for complaints of a headaches and blurry vision, where an MRI showed "incidental demyelinating disease with a lesion in the corpus callosum."  (Tr. 342, 736, 791, 796-798.)  On July 24, 2014, Ms. Roberts attended a follow up visit for her MS with Jeffrey Cohen, M.D. at the Mellen Center at the Cleveland Clinic.  (Tr. 745.)  She reported that she was not on any current disease therapy for MS, but was experiencing physical symptoms and wanted to see if she needed to be on treatment.  (Tr. 746.)  In addition to physical symptoms, she reported decreased concentration and a decline in short term memory, such that she would walk into a room and forget what she was there for.  (*Id.*)  She also reported problems with falling asleep and staying asleep.  (*Id.*)  She reported that her mood was stable and she was not depressed.  (*Id.*)  She noted that she was not working, having previously quit her job to care for her now deceased mother.  (*Id.*)  On examination, she displayed normal levels of consciousness, orientation, language, praxis, and higher intellectual function, and did not appear depressed.  (Tr. 747.)  She was started on medications for her MS, but no separate recommendations were made regarding her reported memory or sleep problems.  (Tr. 748.)

During a follow-up visit with Charlene Fink, CNS at the Mellen Center on October 24, 2014, Ms. Roberts reported medication compliance and no significant change/worsening of her neurologic status since her last appointment.  (Tr. 736.)  She reported a stable mood, occasional word finding difficulty, decreased concentration, and difficulty sleeping and falling asleep.  (*Id.*)

She also reported she was thinking about going back to work.  (Tr. 737.)  She did not think she was eligible for disability, and did not feel she was disabled at the time.  (*Id*.)  Mental status examination findings remained normal.  (*Id*.)  No changes were made to her medications, and no specific recommendations were made regarding her reported memory, concentration, or sleep problems.  (Tr. 738.)  She was instructed to follow up in six months.  (*Id.*)

During MS follow-up visits at the Mellen Center throughout 2015 and 2016, Ms. Roberts' mental status findings continued to be normal.  (*See e.g.*, Tr. 730 (April 6, 2015), Tr. 703 (July 14, 2015), Tr. 692 (November 9, 2015), Tr. 615 (July 26, 2016).)  On November 9, 2015, she reported that her memory was okay, she was sleeping eight hours, and she was going on cruise in December.  (Tr. 691.)  On July 26, 2016, she reported that her mood was good, but she was sleeping four hours and having some problems falling back asleep.  (Tr. 614.)  She also reported that her short-term memory was worsening, and that she felt forgetful and had to write things down more often.  (Tr. 615.)  Her mental examination findings remained normal.  (*Id.*) She was instructed to continue her medications, and was found to be stable with no symptomatic or psychosocial issues.  (Tr. 616.)  Neuropsychological ("NP") testing was ordered.  (Tr. 616.)

At a January 19, 2017 Mellen Center follow-up, Ms. Roberts indicated that she felt her MS was under control with medication, but reported that her "main concerns" included her memory.  (Tr. 601.)  She had not been scheduled for neuropsychological testing as previously ordered.  (*Id.*)  She stated that her mood was good and her sleep was okay, but complained of moderate fatigue and was reported trouble with her short-term memory, multi-tasking, and finding words.  (Tr. 601.)  Her mental status examination remained normal.  (Tr. 602.)  She was referred again for "NP testing," in addition to other testing and imagery.  (Tr. 603.)

Ms. Roberts next followed up with CNS Fink at the Mellon Center on July 14, 2017, where she reported doing well overall since her last visit, with no change in her "neuro status." (Tr. 562.)  She reported speaking to Dr. Parons about her neuropsychological testing, indicating that he recommended "voc rehab and seeing psychology."  (*Id.*)  She worried about scheduling those appointments because she had heard that the Cleveland Clinic Foundation would no longer be covered by her insurance.  (*Id.*)  She also reported thinking of moving to Indiana, but would want to find a job there first.  (*Id.*)  With respect to her symptoms, she reported that she did not feel stress, but had some fluctuations in mood and mood swings.  (*Id*.)  She continued to report moderate fatigue, and indicated that her memory/concentration were fair, with no change.  (*Id*.)  Her mental status examination findings remained normal.  (Tr. 563.)

CNS Fink's office visit notes summarize findings from a reported May 26, 2017 neuropsychological evaluation as follows:

> Neuropsychological evaluation revealed impaired attention, memory and executive function. The degree of cognitive impairment was significantly greater than might be expected from her MS, based on the extent of lesion burden seen on MRI. Furthermore, the patient's information processing speed, the cognitive domain most sensitive to MS neuropathology, was a relative strength and consistently in the average[.] On emotion related measures, the patient indicated mild to moderate depression. This constellation of findings suggests that the patient's cognitive difficulties may be due in part to MS but are being greatly exacerbated by other factors, most likely emotional distress/disturbance. [1]

(Tr. 564.)  Based on the findings in the evaluation, psychological evaluation and treatment was recommended, including individual cognitive behavioral therapy, group therapy for social support, and antidepressant medication.  (Tr. 564-565.)  It was also noted that Ms. Roberts might benefit from cognitive rehabilitation therapy with a speech therapist to help her develop compensatory strategies to improve her attention and memory.  (Tr. 565.)  While her overall

---

[1] This May 26, 2017 neuropsychological evaluation is not in evidence, but is also referenced in the 2019 neuropsychological evaluation report prepared by Ashley Miller, Ph.D., discussed *supra*.  (*See* Tr. 2156-57.)

disease status was assessed as stable, Ms. Roberts was noted to have symptomatic memory issues and psychosocial mood issues.  (*Id.*)

On July 31, 2017, Ms. Roberts initiated care with Janella Clarke, SLP at the Cleveland Clinic for a speech, language, and cognitive linguistic evaluation.  (Tr. 559.)  Ms. Roberts was seen "for a diagnostic related to cognitive-linguistic impairment secondary to [MS]."  (*Id.*)  She reported that she could be mid-sentence and forget what she was trying to say, that she relied on two paper calendars and the calendar on her phone to note appointments, that she used alarms and a notebook, and that new information was harder for her to retain.  (*Id.*)  She described her prior level of functioning as "independent in all communicative parameters," but reported that her "memory for reading was difficult in junior high and high school," that she struggled with math and Spanish, and that she was a C student in her other classes.  (*Id.*)  Ms. Clarke observed that Ms. Roberts presented with a "mild cognitive linguistic impairment as characterized by reduced word fluency with intact object and verb naming picture to picture stimuli."  (Tr. 561.)  She also noted that Ms. Roberts's "[a]uditory comprehension of complex syntax and paragraph level content [were] intact with impaired free and delayed recall," and that her "[n]ew learning, delayed recall, and working memory [were] impaired."  (*Id.*)  Functional impairments included a reduced ability to manage her appointments and medications, and to follow and participate in conversations.  (*Id.*)  It was recommended that she follow up with two visits per week for four weeks of individual skilled speech therapy services.  (*Id.*)

Ms. Roberts cancelled her scheduled therapy session with Ms. Clarke on August 4, 2019, but attended on August 9, 2017.  (Tr. 557-558.)  She tolerated the treatment session well, but "continue[d] to demonstrate cognitive-linguistic impairment which [was] negatively impacting [her] ability to effectively complete IADL medical and family/household responsibilities." (Tr.

558.)  She did not attend another speech therapy session until August 31, 2017, where she reported improved memory but continued frustration with a reduced ability to process information at the conversational level.  (Tr. 555-556.)  She was instructed to follow up for one visit per week for eight weeks of individual skilled speech therapy services.  (Tr. 557.)

Ms. Roberts did not return to speech therapy until October 26, 2017.  (Tr. 551.)  She continued to exhibit impaired cognitive-linguistic skills with limited memory and word finding, and was found to be progressing slower than expected due to pain hindering her attendance at therapy.  (*Id.*)  Subjectively, she reported having more difficulty retaining information in conversation and some difficulty saying words even when she could think of them.  (Tr. 552.)  Testing demonstrated some trouble finding words.  (*Id.*)  Ms. Roberts was advised to follow up for one visit per week for two weeks of individual skilled speech therapy services.  (*Id.*)

Ms. Roberts did not return to therapy until November 10, 2017.  (Tr. 532.)  She continued to demonstrate difficulty with working memory, delayed recall, and anomia, but was progressing slower than expected due to poor participation, having only attended five therapy sessions since her evaluation in July 2017.  (*Id.*)  Ms. Clarke found that Ms. Roberts was "not able to attend consistently or frequently enough to benefit from continued skilled therapy."  (*Id.*)  On objective testing, she was initially "able to recall 4 pieces of information," but with repetition "was then able to recall 13 pieces of information," and also "recalled 13 pieces of information" with "15 minute delayed free recall."  (Tr. 533.)  It was recommended that Ms. Roberts discontinue speech therapy due to her inability to consistently attend scheduled sessions, but it was noted that "[s]killed services may be an option when [Ms. Roberts] is better able to manage her symptoms that prevent attendance."  (Tr. 532.)

Ms. Roberts primarily complained of physical symptoms at her follow-up at the Mellon

Center on March 27, 2018, following a hospitalization for cardiac arrest and defibrillator

placement.  (Tr. 380.)  Her mental status examination continued to show normal levels of

consciousness, orientation, language, memory, praxis, higher intellectual function, and normal

affect.  (Tr. 382.)  Plans were made to start a new MS medication, and no psychosocial issues

were noted.  (Tr. 383.)

At her Mellon Center follow-up on December 17, 2018, Ms. Roberts continued to

complain of physical symptoms, and reported going on a relaxing cruise the prior week.  (Tr.

2130-2132.)  While she denied feeling depressed, she did report moderate fatigue, problems

falling asleep, and issues with her memory/concentration, including misplacing objects, trouble

multi-tasking, losing her train of thought, trouble finding words, getting lost in conversation, and

better long-term memory than short-term.  (Tr. 2132-2133.)  Mental examination findings

continued to show normal levels of consciousness, orientation, language, memory, praxis, higher

intellectual function, and normal affect.  (Tr. 2134.)  Neuropsychological testing for memory was

recommended, and she was referred to psychology was "for mood and insomnia."  (Tr. 2136.)

On January 22, 2019, Ms. Roberts presented to Ashley Miller, Ph.D. for a

neuropsychological evaluation.  (Tr. 2156-2159.)  She relayed that she had last worked in 2012,

after stopping work to care for her mother and then being diagnosed with MS shortly thereafter.

(Tr. 2156.)  She indicated that her MS had been characterized as relapsing-remitting.  (*Id.*)  Dr.

Miller noted findings from the May 26, 2017 neuropsychological evaluation that Ms. Roberts'

"cognitive difficulties may be due in part to MS, but are being greatly exacerbated by other

factors, most likely emotional distress/disturbance." (Tr. 2156-2157.)  With respect to her new

neuropsychological evaluation, Dr. Miller explained:

> Presently, Ms. Roberts reported continued difficulty with short term memory,
> losing her train of thought mid conversation, and word finding difficulties.  She
> noted that she often forgets people's names, if she has already told someone
> something, and finds herself having to re-read instructions and recipes.  She
> indicated that she believes her cognitive problems started around the time she was
> diagnosed with MS and have gradually worsened overtime.  Notably, she reported
> past participation in cognitive rehabilitation in 2016/2017, which she found to be
> helpful. Repeat neuropsychological evaluation was requested to monitor cognitive
> symptoms and assist in treatment planning.

(Tr. 2157.)  Dr. Miller noted that Ms. Roberts reported living with her father and being able to

take care of her daily activities without significant difficulty, but indicated physical pain and low

energy sometimes interfered with her cooking and other physical activities.  (*Id.*)  Ms. Roberts

"described feelings of anhedonia" but "reported no history of mental health treatment."  (*Id*.)

Dr. Miller observed that Ms. Roberts communicated her history clearly and coherently,

and had normal recall of recent and remote details, intact auditory comprehension, and logical

and goal directed thought content.  (*Id.*)  Her mood was depressed, with congruent but reactive

affect and some tearfulness when discussing her MS diagnosis.  (*Id.*)  Her spontaneous speech

was fluent and well-articulated, but notable for word finding difficulties.  (*Id.*)  She had no

difficulty following task instructions, but approached manual tasks more slowly.  (*Id.*)  She had a

tendency to give up when tasks were more difficult, but responded well to encouragement.  (*Id*.)

Ms. Roberts's neuropsychological examination results included average to low average

findings for single word reading, perceptual reasoning, working memory, processing speed,

vocabulary, verbal fluency, visual confrontation, immediate and delayed free recall of narrative

passages, recognition discrimination, and immediate and delayed recall of visuospatial designs.

(Tr. 2157-58.)  On a challenging measure of auditory attention and working memory, she had

trouble understanding and following task instructions so that the task was discontinued. (Tr. 2157.) Performance on a measure of visuospatial judgment was extremely low, and her copy of a complex geometric design was distorted and notable for a poor organizational approach. (*Id.*) Total recall of a word list was extremely low, with a positive but shallow learning curve and performance notable for perseveration. (Tr. 2158.) Delayed free recall was borderline, and performance on a test of abstract reasoning and hypothesis testing was somewhat below expectation. (*Id.*) On self-report measures of emotional functioning, Ms. Roberts reported severe symptoms of anxiety and depression, but denied suicidal ideation, intent or plan. (*Id.*)

In comparing Ms. Roberts new neuropsychological examination findings to the findings from her prior 2017 examination, Dr. Miller observed:

> Overall, that comparison revealed moderate improvements on tasks of confrontation naming, phonemic verbal fluency, memory encoding of visuospatial material, cognitive flexibility and new learning of a decision making task and mild to moderate declines on measures of visuospatial analysis and psychomotor processing speed. She also reported a significant increase in symptoms of anxiety and depression on self-report inventories. These changes may reflect normal fluctuations over time or situational factors, including practice effects, mood symptoms, and fatigue.

(Tr. 2158.) Following her examination, Dr. Miller's impression was as follows:

> This neuropsychological evaluation was most notable for a severe level of anxiety and depression reported on self-report inventories. Her cognitive test data revealed weaknesses on measures of word list encoding, aspects of executive function (i.e., decision making, abstract verbal reasoning, auditory working memory), visuospatial analysis, and evidenced of reduced processing speed. Qualitatively, her assessment was remarkable for poor organization on complex figure copying and perseveration on word list learning. Otherwise, the remainder of Ms. Roberts' cognitive test data were within expectation for her age and education, with scores in the broad average range across measures. Overall, findings are generally suggestive of mild frontal systems dysfunction, the etiology of which likely reflects her history of MS as well as mood symptoms, pain, and fatigue, which are likely serving to exacerbate cognitive difficulties.

(*Id.*) Dr. Miller strongly encouraged Ms. Roberts to treat her symptoms of anxiety and depression, and also encouraged her to use strategies learned through cognitive rehabilitation to

10

manage her day-to-day cognitive difficulties, to discuss her sleep-related problems with her providers, and to be physically, socially, and cognitively active.  (*Id.*)

On January 24, 2019, Ms. Roberts initiated treatment with Psychologist Amy Sullivan, Psy.D. and Psychology Fellow Amy Diggins, Ph.D. for depression, fatigue, and insomnia.  (Tr. 2163-68.)  On evaluation, she described her mood as "holding on by string because of domino effect."  (Tr. 2166.)  She reported symptoms that included depressed mood most of the day, sadness, tearfulness, fatigue or loss of energy, problems with memory and concentration, changes in weight and appetite, and problems with sleep.  (*Id.*)  She rated her level of depression as 2/10, with 10 being the worst, and reported having a depressed mood four times per week. (Tr. 2167.)  She rated her level of anxiety symptoms as a 10/10, explaining that she "attributed [her] anxiety to her health and 'snowballing' stressors."  (*Id.*)  She reported frequent flashbacks to a traumatic incident, but denied mania, panic, obsessive-compulsive behaviors, psychosis, and suicidal ideation.  (*Id.*)  Other than a reported depressed mood, her mental status examination findings were normal.  (*Id.*)  She reported that her anxiety and depression began after her MS diagnosis, that her increase in mood symptoms began after an adverse reaction to medication that caused cardiac arrest in March 2018, and that she feared further medical complications.  (Tr. 2168.)  She was diagnosed with anxiety disorder, not otherwise specified ("NOS"), and depressive disorder, NOS, with a note to rule out a possible diagnosis of post-traumatic stress disorder.  (*Id.*)  It was recommended that Ms. Roberts continue with stress management, attend a weekly MS support group, and follow up with psychology in four to six weeks.  (*Id.*)

Ms. Roberts attended MS group psychotherapy on February 21, 2019 at the Cleveland Clinic with Alexa Kane, Psy.D., Clinical Psychology Postdoctoral Fellow and Dr. Sullivan.  (Tr. 2201.)  Her mental status examination reflected that she behaved appropriately, was euthymic,

had appropriate speech and language, her affect was full and appropriate to topic, and her insight

and judgment were appropriate.  (Tr. 2201-2202.)  She was diagnosed with anxiety disorder,

depressive disorder, and MS.  (Tr. 2202.)

Ms. Roberts attended her first session of a stress management protocol on February 21,

2019.  (Tr. 2207-2208.)  She reported improvements in her health since her last visit, allowing

her to re-engage in pleasurable activities such as cooking.  (Tr. 2207.)  Nevertheless, she

reported continued problems with her physical health, problems with sustained sleep and

forgetfulness, and she always feeling "on edge" because she feared having another heart

complication.  (*Id*.)  She also reported familial strain, with "frustrating" conversations with her

family about her inability to return to work, but also relayed that she felt that the MS support

group had helped her understand she was not alone with her frustrations and challenges.  (*Id*.)

On examination, she was alert and oriented, her mood was stable, her affect was appropriate, her

insight was good, her judgment was adequate, and she denied suicidal ideation, intent, or plan.

(Tr. 2208.)  Her diagnoses remained the same, and her symptoms of depression and anxiety were

noted to have continued since her initial evaluation, with current symptoms associated with

recent medical complications.  (*Id.*)  She was advised to follow up in four to six weeks.  (*Id*.)

Ms. Roberts attended another MS group psychotherapy session on February 28, 2019

with Dr. Kane, where she was noted to be an active participant in the group discussion.  (Tr.

2214.)  Examination findings were similar to those from her prior session, and she was advised

to return for another group therapy session in one week.  (Tr. 2214-2215.)

Ms. Roberts returned for her second session of the stress management protocol on April

18, 2019, two months after her first session.  (Tr. 2228.)  She reported an increase in

interpersonal problems and memory problems since her prior session, having had verbal

12

altercations with a close friend who was visiting from out of state.  (*Id.*)  She also complained of aggravation with her inability to recall information or learn new skills, and said she was working on identifying triggers to anger.  (*Id*.)  Her mental status examination findings remained normal, and her diagnoses remained the same.  (Tr. 2229.)  She was instructed to continue her psychoeducation, CBT, and relaxation skills, and to follow up in four to six weeks.  (*Id*.)

She returned for her third session of the stress management protocol on June 13, 2019. (Tr. 2272.)  She reported an increase in fatigue and pain since the prior session, saying she had declined an invitation from a friend to attend events over the prior weekend due to fatigue and exhaustion.  (*Id*.)  She also continued to report word finding difficulties and forgetfulness, which was extremely frustrating to her.  (*Id*.)  She was trying to manage her stress by cooking and listening to music.  (*Id*.)  She also reported having problems falling and staying asleep, noting that she felt her problems sleep might be related to her mind racing at night.  (*Id*.)  Mental status examination findings remained normal.  (Tr. 2273.)  Her diagnoses remained unchanged, and recommendations were made to continue with therapy, focus on acceptance and management of her disease, practice relaxation skills, and return in four to six weeks.  (*Id*.)

On July 11, 2019, Ms. Roberts returned for her fourth and final session of the stress management protocol.  (Tr. 2327.)  She reported increased irritability due to problems with her family, and relayed that she had been working on establishing boundaries and had been better able to identify triggers to her stressors.  (*Id*.)   Mental examination findings remained normal, and her diagnoses remained unchanged.  (Tr. 2328.)  It was noted that her symptoms of depression and anxiety had continued since her initial evaluation, with current symptoms associated with medical complications and interpersonal problems, but that "patient reported benefit from participating in stress management protocol and learning cognitive and behavioral

13

strategies to better manage symptoms long term." (*Id.*)  She was instructed to follow up as

needed, and to participate in MS support groups.  (*Id.*)

On July 25, 2019, Ms. Roberts attended a MS group psychotherapy session with Dr.

Sullivan, where she introduced herself to the new group.  (Tr. 2368.)  This appears to have been

her first group therapy session since she was advised to attend weekly therapy in February 2019.

(Tr. 2214-2215.)  Mental status examination findings remained normal, with Ms. Roberts noted

to be well dressed and groomed, with a euthymic mood, appropriate tone, prosody, cadence,

phonetics, and syntax, full and appropriate affect, orientation to person, place, time, and

situation, intact and linear associations, and appropriate insight and judgment.  (Tr. 2368.)  She

was instructed to return for group therapy in one week.  (Tr. 2369.)

### 2.      Opinion Evidence

#### i.      Psychological Consultative Examination

On October 22, 2018, Ms. Roberts attended a consultative psychological evaluation with

Psychologist Herschel Pickholtz, Ed.D.  (Tr. 1808-1815.)  When asked what prevented her from

working, Ms. Roberts responded "My health and I had a defibrillator put in March of 2018 and

medications that I take for MS."  (Tr. 1809.)  With respect to her behavioral health history, she

reported speaking to a psychiatrist once before.  (Tr. 1810.)  She also reported that she started to

receive speech therapy and went a few times, but "got bad headaches and quit going."  (*Id.*)

Dr. Pickholtz observed that Ms. Roberts' pace and persistence during the evaluation fell

within the average range.  (Tr. 1810.)  She reported experiencing some level of depression since

2012, and described her current depression as mild and occurring once a month for about 3 hours

per occurrence.  (*Id.*)  She reported that her past depression was "[b]ecause of physical

problems."  (*Id.*)  She reported that she was not taking psychiatric medications or receiving

14

counseling, and reported that her affective symptoms without psychiatric medications were

minimal.  (*Id.*)  She reported no anxiety complaints, and no autonomic signs of anxiety were

observed.  (*Id.*)  She reported having some problems recalling words to express herself, and

sometimes forgetting "short-term memory facts," but reported no paranoid delusionary ideation

or delusions of grandiosity, no hallucinations, and no post-traumatic stress complaints.  (*Id.*)  She

was noted to be ingesting minimal alcoholic beverages and three to four marijuana "joints" per

week.  (*Id.*)  She reported obtaining a high school education in regular education classes, but

reported "I always forgot what I read."  (Tr. 1811.)

On examination, she "sniffled quite a bit," had a tone of voice that "appeared to be just a

little bit sad," a slightly constricted affect, a slightly depressed mood, and showed motoric

activity that "appeared to be just a little bit constricted and a little bit slow."  (Tr. 1811-1812.)

She reported experiencing mild depression because of her physical problems about once per

month for about three hours, without any psychiatric treatment.  (Tr. 1812.)  Her facial

expressions were observed to be fairly full, and she laughed several times and did not shed any

tears.  (*Id.*)  It was noted that she appeared like she was groping for words once in a while during

the evaluation, but that this appeared to be very mild.  (Tr. 1812.)  She was observed to have

dressed neatly and appropriately, and demonstrated appropriate eye contact, average rate and

volume of speech, and verbalizations that were logical, coherent, relevant, and goal directed.

(Tr. 1811-1812.)  She was well oriented, with her recall abilities, intellectual functioning,

arithmetical capacities, capacity for abstract thinking estimated to fall in the low average range.

(Tr. 1812.)  Dr. Pickholtz found that her "overall capacities for associative thinking and

cognitive level of functioning approximated the low average range," and that her intelligence fell

within the low average range based on her responses to cognitive testing and her description of

15

her daily activities. (Tr. 1812-1813.) Ms. Roberts stated her daily activities included performing household chores, shopping, using the internet, watching television, reading, socializing regularly with friends, and occasionally attending religious services during the year. (Tr. 1813.)

Dr. Pickholtz diagnosed Ms. Roberts with unspecified depressive disorder, currently mild. (Tr. 1814.) He also noted her "history of mild neurocognitive disorder related to MS versus cardiac arrest." (*Id*.) Based on his examination, he opined that she had no impairment in her ability to understand, remember, and carry out instructions for simple work activities, and "a slight impairment at worst" in her ability to understand, remember, and perform more complex work activities. (Tr. 1815.) He also opined that she had no impairment in her ability to perform one-to-two step tasks, and "a slight impairment at worst" in her ability to perform three-to-four step tasks. (*Id*.) He similarly opined that she had "a slight impairment at worst" in her ability to respond to supervision and coworkers in a work setting due to some mild difficulties in her ability to recall words to express herself. (*Id*.) Finally, he opined that she had "a slight impairment at worst" in her ability to respond to work pressures in a work setting. (*Id*.) He also felt that she would be able to independently monitor benefits if awarded. (*Id*.)

### ii.    State Agency Reviewing Medical Consultants

On November 3, 2018, state agency reviewing medical consultant Aracelis Rivera, Psy.D. completed a Psychiatric Review Technique ("PRT"). (Tr. 79-80.) In the PRT, Dr. Rivera opined that Ms. Roberts had mild limitations in her ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 80.) Dr. Rivera further opined that she "does not have a severe psychological impairment that limits her functioning at this time." (*Id*.)

16

On December 14, 2018, state agency reviewing medical consultant Carl Tishler, Ph.D. completed a PRT at the reconsideration level and agreed with Dr. Rivera's prior administrative medical findings.  (Tr. 118-119.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At her November 5, 2019, hearing, Ms. Roberts testified in response to questioning by the ALJ and her representative.  (Tr. 47-63, 64-65, 68-73.)  When asked by her counsel what prevented her from working, she responded in part:

> A   For one, I would have to say -- I'm trying to get the word out and I can't even get it out.  Trying to remember.
>
> Q   Your memory?
>
> A   My memory is not what it used to be, and try to recall certain words.  Or I've noticed like if someone's talking to me, I won't remember everything that's been said.

(Tr. 55.)  With her word finding difficulties and forgetting what she is going to say, she explained that she stuttered at times.  (Tr. 56, 68-69.)  She explained that she experienced other symptoms (e.g., headaches, vision problems, numbness and tingling) due to her MS, but she felt that her memory loss was the biggest symptom that she noticed from her MS.  (Tr. 56.)

She reported living with her father, explaining that they shared household chores such as cleaning and cooking, but reporting that she did most of the grocery shopping.  (Tr. 47-48.) When asked how she generally spent her time, she said she watched television, cleaned the house, cooked, attended doctor appointments, visited with her best friend who lived about ten minutes from her home, and went to the mall and had dinner with her boyfriend.  (Tr. 48-50.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 63-67.)  The VE classified Ms. Roberts's past work as that of a dispatcher, a skilled sedentary exertional job that she performed at the sedentary level, and a customer service representative, a semi-skilled sedentary exertional job that she performed at the light level.  (Tr. 65.)

For her first hypothetical, the ALJ asked the VE whether the below described individual would be able to perform Ms. Roberts's past work:

> a person of the claimant's age, education, and that past relevant work activity, who has a residual functional capacity for light work, with climbing ramps and stairs occasionally, but never climbing ladders, ropes, or scaffolds; who could frequently balance, stoop, kneel, crouch, crawl, and who would have to avoid all exposure to hazards, such as industrial machinery, unprotected heights and commercial driving.

(Tr. 66.)  In response, the VE testified that both past jobs would be available within that hypothetical.  (*Id.*)

In response to questioning from Ms. Roberts's counsel, the VE indicated that there would be no jobs available if the individual described in the hypothetical was also off task on average about twenty percent of the time.  (Tr. 66-67.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[2]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107

S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in

the national economy.  *Id.*

## IV. The ALJ's Decision

In her December 26, 2019, decision the ALJ made the following findings:[3]

1.    The claimant meets the insured status requirements of the Social Security
      Act through September 30, 2016.  (Tr. 12.)

2.    The claimant has not engaged in substantial gainful activity since January
      25, 2012, the alleged onset date.  (Tr. 12.)

3.    The claimant has the following severe impairments: multiple sclerosis,
      heart failure status post pacemaker placement, degenerative disc disease,
      osteoarthritis and impingement of the left shoulder, obesity, hypertension,
      optic neuritis, and retrobulbar neuritis. The claimant had other physical
      impairments that were non-severe, and her mental impairments were non-
      severe.  (Tr. 12-15.)

4.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments.  (Tr.
      15-16.)

5.    The claimant has the residual functional capacity to perform light work as
      defined in 20 C.F.R. § 404.1567(b) except she can occasionally climb
      ramps and stairs; can never climb ladders, ropes, or scaffolds; can
      frequently balance, stoop, kneel, crouch, and crawl; and she must avoid all
      exposure to hazards such as industrial machinery, unprotected heights, and
      commercial driving.  (Tr. 16-21.)

6.    The claimant is capable of performing her past relevant work as a customer
      service representative and dispatcher.  (Tr. 22.)

---

[3] The ALJ's findings are summarized.

20

Based on the foregoing, the ALJ determined that Ms. Roberts had not been under a disability, as defined in the Social Security Act, from January 25, 2012, through the date of the decision. (Tr. 12-22.)

## V. Plaintiff's Argument

Ms. Roberts presents one argument in this appeal. She contends the ALJ erred by finding that she had no severe mental health impairment. (ECF Doc. 17, pp. 1, 13-18.)

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

21

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), *quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B. Whether ALJ Erred in Finding Ms. Roberts' Mental Impairments Nonsevere

Ms. Roberts contends that the ALJ erred by finding that her "diagnosed cognitive dysfunction, depression, and anxiety disorders did not constitute severe impairments" and by

"fail[ing] to incorporate any mental restrictions into Ms. Roberts's assigned residual functional capacity."  (ECF Doc. 17, p. 13).  She argues that the ALJ cherry-picked portions of the medical record, "while ignoring the substance of the evidence that reflects significant mental limitations," and therefore failed to build an accurate and logical bridge between the evidence and her Step Two determination.  (*Id.* at pp. 13-15.)

### 1.    Analysis for Step Two Determinations

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities.[4]"  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

With respect to consideration of mental health impairments, an ALJ is required to rate a claimant's degree of limitation in the following four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself, using a "five-point scale" of "[none, mild, moderate, marked, and extreme."  20 C.F.R. §§ 404.1520a(a)-(c), (e).  "The four broad functional areas are also commonly referred to as the "paragraph B" criteria."  *Avers v. Kijakazi*, No. 3:20-CV-01433, 2021 WL 4291228, at *9 (N.D. Ohio Sept. 21, 2021) (citing *Powell v. Comm'r of Soc.*

---

[4] Being able to do basic work activities, means having "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."  (*Id.*)

*Sec.*, No. 5:15 CV 1775, 2016 WL 5364419 (N.D. Ohio Sep. 26, 2016)).  If a claimant's degree of limitation is rated "as 'none' or 'mild,'" the conclusion will generally be that a claimant's "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).

The Sixth Circuit has construed Step Two as a *de minimis* hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'"  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)).  Although the standard is *de minimis*, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

Where an ALJ has identified both severe and nonsevere impairments, the Sixth Circuit has sometimes held that an ALJ decision finding some impairments nonsevere was not reversible error because the Commissioner could still consider the nonsevere impairments in assessing the RFC.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (finding it "legally irrelevant" that some impairments were not deemed severe where the designation of other impairments as severe "cleared step two of the analysis" and thus caused the ALJ to consider both "severe and nonsevere impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of*

24

*Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment at step two).

However, this harmless error standard is not applicable where an ALJ has failed to consider the nonsevere impairments in assessing the RFC. *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190-191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found that plaintiff's nonsevere mental impairments "would not be considered in assessing her RFC"); *Dudley v. Comm'r of Soc. Sec.,* No. 2:16-CV-0682, 2017 WL 2374432, at *4 (S.D. Ohio June 1, 2017) (finding harmless error did not apply to finding mental impairments nonsevere when ALJ "did not take any mental impairments or limitations into account" in the RFC), *report and recommendation adopted*, No. 2:16-CV-682, 2017 WL 2645962 (S.D. Ohio June 20, 2017); *Rose v. Comm'r of Soc. Sec.*, No. 2:14-CV-1901, 2015 WL 6735313, at *5 (S.D. Ohio Nov. 4, 2015) (finding harmless error analysis "is appropriate only when the ALJ properly considered any functional limitations arising from non-severe impairments when crafting his residual functional capacity finding"), *report and recommendation adopted*, No. 2:14-CV-1901, 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015); *see also Pompa,* 73 F. App'x at 803 (applying harmless error standard where "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment finding").

Moreover, where the ALJ has considered a nonsevere impairment in assessing the RFC but found no related functional limitations, "[t]he question then becomes whether the ALJ's decision not to find any limitations arising from the condition in question is supported by substantial evidence" *Rose,* 2015 WL 6735313, at *5; *see also Simpson,* 344 F. App'x at 190-191 (finding ALJ lacked substantial evidence to find plaintiff had no mental limitations after

relying on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 787–88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support no mental limitations after mischaracterizing evidence and misstating the treating doctor's findings); *Owens v. Comm'r of Soc. Sec.*, No. 1:14-CV-554, 2015 WL 2084703, at *4 & n.7 (S.D. Ohio May 4, 2015) (finding ALJ committed reversible error when substantial evidence did not support finding that impairment was nonsevere and ALJ failed to include related limitations in the RFC).

In this case, the ALJ discussed Ms. Roberts' mental impairments and related treatment findings at length (Tr. 13-15) and stated that she had "considered the effects of all of [Ms. Roberts'] impairments, both severe and nonsevere, in the determination of [her] residual functional capacity" (Tr. 15).  Because the ALJ concluded that the evidence does not support "more than a minimal limitation in [Ms. Roberts'] ability to do basic work activities" (Tr. 15) and adopted an RFC without any mental limitations (Tr. 16), the question becomes whether the ALJ's findings that the mental impairments were nonsevere and did not cause functional limitations were supported by substantial evidence, i.e., "more than a scintilla of evidence but less than a preponderance" and "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *See Besaw*, 966 F.2d at 1030.

### 2.    Whether ALJ Determination that Mental Impairments are Nonsevere and Cause No Functional Limitations is Supported by Substantial Evidence

When evaluating Ms. Roberts's alleged mental health impairments, the ALJ considered and discussed at length the medical evidence relating to her assessment and treatment for depression, anxiety, and word-finding difficulties.  (Tr. 13-14.)   First, she acknowledged that Ms. Roberts complained of word finding difficulty and memory problems to her MS provider, and underwent a 2017 neuropsychological examination that "'revealed impaired attention, memory and executive function'" where "'[t]he degree of cognitive impairment was significantly

26

greater than might be expected from her [multiple sclerosis].'" (Tr. 13 (citing Tr. 564).) During the same time period, the ALJ noted that the mental status examination findings of her MS treatment provider revealed "normal language skills and memory." (Tr. 13 (citing Tr. 561, 563).)

The ALJ next described the "speech, language, and cognitive linguistic evaluation" in 2017 where the SLP examiner "found her to have a 'mild' cognitive linguistic impairment with reduced word fluency, and offered a course of speech therapy." (Tr. 13 (citing Tr. 559, 561).) While Ms. Roberts engaged in speech therapy and reported some improvement, the ALJ noted that the speech therapist ultimately discontinued services because Ms. Roberts "was 'not able to attend consistently or frequently [enough] to benefit from continued skilled therapy,' and that her skills were not progressing due to 'poor participation.'" (Tr. 13 (citing Tr. 532).) The ALJ noted that Ms. Roberts' MS providers continued to note "'normal' language." (Tr. 13 (citing Tr. 382).)

The ALJ next discussed the observations of Dr. Pickholtz in the 2018 psychiatric consultative examination that Ms. Roberts "has a 'slightly' constricted affect and depressed mood, and 'once in a while … looked as though she were groping for words but it appeared to be very mild.'" (Tr. 13-14 (citing Tr. 1812-1814).) The ALJ observed that Dr. Pickholtz diagnosed Ms. Roberts with unspecified depressive disorder and outlined Ms. Roberts' self-report that she was able to perform activities of daily living that included daily hygiene, household chores, socializing with friends, watching television and using a computer for recreation. (*Id.*)

Finally, the ALJ discussed the 2019 neuropsychiatric examination findings of Dr. Miller, described as follows: "[T]he claimant showed a 'mild' frontal systems dysfunction, but actually showed improvement over her 2017 study, with results largely within expectation for a woman of her age and education." (Tr. 14 (citing Tr. 2158).) The ALJ also noted that Ms. Roberts

27

began regular treatment with a psychologist in 2019, with consistent mental status examination findings of "euthymic mood, appropriate behavior, and good grooming."  (Tr. 14 (citing Tr. 2167-2168, 2201, 2207-2208, 2214, 2228-2229, 2272-2273, 2328, 2368).)

Based on the described analysis of the mental health treatment records, the ALJ rated Ms. Roberts' degree of limitation in all four areas of mental functioning, concluding that she had mild limitations in all four broad functional areas, as follows:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has mild limitation. As above, the claimant's medical sources and examiners noted "mild" or "very mild" difficulty with word finding; however, Dr. Pickholtz measured short- and long-term memory in the "low average" range during formal testing. (Exhibit 2F, p. 5). At no point did any of the claimant's providers observe any difficulty describing her symptoms or calling to mind aspects of her treatment, and during her hearing she was able to speak at length about his treatment and work history without any apparent difficulty remembering or understanding details. (Hearing Testimony).

> The next functional area is interacting with others. In this area, the claimant has mild limitation.  Dr. Pickholtz did observe a "slightly" depressed mood, and her second neuropsychological examiner did report that she was "tearful at times when discussing her [multiple sclerosis] diagnosis,["] which would have at least some disconcerting effect upon others. (Exhibit 2F, p. 5; Exhibit 9F, p. 46). However, the claimant admitted that she was able to maintain a relationship with a boyfriend, and with her father with whom she lived, and that she had friends with whom she socialized and that she was able to shop in public stores. (Exhibit 2F, p. 6; Hearing Testimony).

> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. She admitted that she retained sufficient focus to drive a car and read books and news articles. At her hearing, she was able to follow lines of questioning and respond with detailed answers. (Id.).

> The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. She reported that she was able to perform her own activities of personal care, administer her own medication, and arrange her own schedule and manage her own transportation as needed. (Hearing Testimony).

> Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's

ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

(Tr. 14-15.)

As a general matter, a finding that Ms. Roberts had no more than mild limitations in each of the four broad functional areas is consistent with a finding that her mental health impairments were nonsevere.  *See, e.g., Dayem v. Comm'r of Soc. Sec.*, No. 1:20-CV-1790, 2021 WL 4290860, at *4 (N.D. Ohio Sept. 21, 2021) ("Because the ALJ concluded that Dayem had no more than mild limitations in any of those categories, the ALJ properly concluded that Dayem's alleged mental health impairments did not have any more than a minimal effect on his ability to work and were, therefore, not severe.").

Ms. Roberts argues that the ALJ's findings in this case are not supported by substantial evidence for three primary reasons.  First, she argues Dr. Miller's specific findings in the 2019 neuropsychological evaluation required a determination that Ms. Roberts' impairments were severe, and that the ALJ's discussion of those findings constituted impermissible cherry-picking. (EFC Doc. 17, pp. 14-15.)  Second, she argues that the ALJ's determination that her mental impairments were nonsevere was not supported by Dr. Pickholtz's consultative examination opinion, despite the ALJ's citation to that opinion in support of the finding.  (*Id.*, pp. 15-16.) Third, Ms. Roberts argues that the ALJ's description of her "mundane activities of daily living is not sufficient rationale to conclude that she has no severe mental impairments."  (*Id.*, p. 16.) Each of these contentions is addressed in turn below.

### i.    Dr. Miller's Neuropsychological Evaluation

Ms. Roberts first contends that "the ALJ appears to be voiding the opinions expressed in neuropsych testing, or, conversely, calling these limitations minimal." (ECF Doc. 17, p. 15.)  As a practical matter, the record reflects that the ALJ considered the neuropsychological evaluation

29

findings of both Dr. Miller in 2019 and a prior provider in 2017.  (Tr. 13-14.)  The question is therefore whether the ALJ mischaracterized the neuropsychological findings or engaged in impermissible cherry-picking in her discussion of the findings.  *See, e.g., Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where ALJ "cherry-picked select portions of the medical record" "[i]nstead of performing a proper analysis of the medical evidence under agency regulations and controlling case law").

In discussing Dr. Miller's neuropsychological evaluation, the ALJ observed that the results "showed a 'mild' frontal systems dysfunction, but actually showed improvement over her 2017 study, with results largely within expectation for a woman of her age and education."  (Tr. 14 (citing Tr. 2158).)  Ms. Roberts argues that this description reflects cherry-picking because "[n]europsych testing indicated cognitive deficits in this matter," and Dr. Miller noted "'severe' levels of anxiety and depression" that warranted a strong recommendation that Ms. Roberts begin treatment with a mental health specialist.  (ECF Doc. 17, p. 15.)

### a.  Discussion of Cognitive Deficits

As to Ms. Roberts' cognitive deficits, the ALJ did specifically reference numerous findings regarding those deficits, noting that: the 2017 neuropsychological examination revealed impaired attention, memory and executive function and cognitive impairment greater than would be expected from MS; the 2017 speech therapist found a mild cognitive linguistic impairment; and the 2019 neuropsychological examination showed mild frontal systems dysfunction, with improvement over the 2017 examination and largely average results.  (Tr. 13-14.)

While the ALJ's summary does not specifically address all findings from Ms. Roberts' examiners and treatment providers regarding cognition, the ALJ is not obligated to discuss every piece of evidence.  *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010)

("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam).  Thus, the question remains whether the ALJ's findings mischaracterized the evidence, i.e., by emphasizing certain findings and failing to recognize others.  A review of the evidence does not suggest that the ALJ engaged such cherry-picking.

Specifically, while Dr. Miller's full written evaluation did make certain cognitive findings that were not cited by the ALJ, her ultimate clinical impression based on all of those findings was that "[o]verall, findings are generally suggestive of mild frontal systems dysfunction" (Tr. 2158), consistent with the ALJ's summary (Tr. 14).  Similarly, the ALJ's statement that Dr. Miller's findings "actually showed improvement over [the] 2017 study" (Tr. 14) is consistent with Dr. Miller's more specific observation that a comparison to the 2017 findings "revealed moderate improvements on tasks of confrontation naming, phonemic verbal fluency, memory encoding of visuospatial material, cognitive flexibility and new learning of a decision making task and mild to moderate declines on measures of visuospatial analysis and psychomotor processing speed" (Tr. 2158).  Additionally, the ALJ's observation that Dr. Miller's findings were "largely within expectation for a woman of her age and education" (Tr. 14) is consistent with examination findings that were largely in the low-average to average range, albeit with a few noted instances of low performance (Tr. 2157-2158).  The observation is also consistent with Dr. Miller's recorded observations that Ms. Roberts communicated her history clearly and coherently, had normal recall of recent and remote details, intact auditory comprehension, and logical and goal directed thought content, with fluent and well-articulated speech, but notable for word finding difficulties.  (Tr. 2157.)  Thus, the record does not support a

finding that the ALJ mischaracterized or failed to address crucial evidence regarding Dr. Miller's cognitive findings.

### b.  Discussion of Anxiety and Depressive Disorders

With regard to Dr. Miller's reference to "severe" anxiety and depression, it is acknowledged that the ALJ did not cite to Dr. Miller's statement that the evaluation was "notable for a severe level of anxiety and depression reported on self-report inventories," or her strong recommendation that Ms. Roberts begin treatment for anxiety and depression.  (Tr. 2158.) However, the ALJ did generally discuss all of the various treatment records relating to Ms. Roberts' anxiety and depression in reaching her decision.  More specifically, the ALJ noted that Ms. Roberts: was referred to a psychologist after her 2017 neuropsychological examination; was diagnosed with unspecified depressive disorder by consultative examiner Dr. Pickholtz after an examination where she demonstrated a depressed mood and "slightly" constricted affect; and began regular treatment with a psychologist in January 2019, consistently presenting with euthymic mood, appropriate behavior, and good grooming at her treatment sessions.  (Tr. 13-14.)

As with her observations regarding the cognitive findings, the ALJ did not discuss every piece of evidence relating to Ms. Roberts' anxiety or depression, but the record does not support a finding that she mischaracterized or neglected to address critical evidence of record relating to those impairments.  Instead, the record reflects that Ms. Roberts was advised to seek psychological evaluation and treatment for emotional distress in 2017 (Tr. 564) but did not do so. She then attended a consultative examination in October 2018, where she reported only mild depression once per month despite a lack of psychiatric treatment, and presented as "just a little bit" sad/slow/constricted and "slightly" depressed/constricted.  (Tr. 1811-1812.)  With her depression still untreated, Ms. Roberts self-reported severe anxiety and depression in her January

2019 neuropsychological evaluation and was referred for treatment.  (Tr. 2156-2159.)  That treatment included four sessions of a stress management protocol (Tr. 2207-2208, 2228-2229, 2272-2273, 2327-2328) and a few sessions of group therapy (Tr. 2201-2202, 2214-2215, 2368-2369), in which the ALJ correctly observed her mental status examination findings were reported to be normal (Tr. 14).  While the ALJ's discussion of Ms. Roberts' mental health treatment did not address every piece of evidence in the record, a review of the record as a whole does not support a finding that she mischaracterized or neglected to address critical evidence in concluding that Ms. Roberts' anxiety and depression were nonsevere.

Not only does the record fail to support a finding that the ALJ mischaracterized or engaged in cherry-picking with respect to Dr. Miller's findings, it is evident from a review of the record as a whole that the ALJ's consideration of those findings in determining that Ms. Roberts' mental impairments were nonsevere and did not cause functional limitations was supported by substantial evidence.

While Ms. Roberts contends that Dr. Miller's findings support greater limitations than those found by the ALJ, as explained above, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (internal citation omitted).   Thus, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Ms. Roberts has not demonstrated that the ALJ's consideration of Dr. Miller's neuropsychological evaluation fell outside the zone of choice afforded to ALJ.  Nor has she shown that the ALJ's determination that her mental health impairments caused no more than mild limitations in the four broad functional areas is unsupported by substantial evidence.

### ii.    Dr. Pickholtz's Opinion

Ms. Roberts next asserts that the ALJ erred in citing to the consultative examination findings of Dr. Pickholtz in support of her finding "that Ms. Roberts has no severe mental impairments or functional limitations" because Dr. Pickholtz diagnosed her with depressive disorder and "opined that condition may cause slight limitations in all functional domains." (ECF Doc. 17, pp. 15-16.)  On the contrary, a review of Dr. Pickholtz's findings reveals that they are wholly consistent with a finding that Ms. Roberts' mental impairments were nonsevere and did not result in functional limitations.  Certainly, the diagnosis alone "says nothing about the severity of the condition."  *Higg*s, 880 F.2d at 863; *see also Despins*, 257 F. App'x at 930.

With respect to Dr. Pickholtz's findings, the ALJ accurately described the "slight" and "very mild" findings noted in Ms. Roberts' mental status examination, the "low average" findings relating to her memory, as well as the activities of daily living she self-reported to Dr. Pickholtz.  (Tr. 14.)  No information omitted from the ALJ's discussion of Dr. Pickholtz's report suggests greater limitations.  Indeed, one piece of information not discussed by the ALJ was claimant's report to Dr. Pickholtz that her depression symptoms were mild and occurred about one time per month despite a lack of psychiatric treatment.  (Tr. 1812.)  The ALJ accurately described Dr. Pickholtz's stated opinion that Ms. Roberts' limitations in the four functional areas were "no more than 'a slight impairment at worst,'" explaining her rationale for finding Dr. Pickholtz's opinion persuasive as follows:

> The undersigned therefore finds the opinion of Dr. Pickholtz to be persuasive; at the conclusion of his examination report, the doctor opined that she had no more than "a slight impairment at worst" in any of the core areas of mental functioning. (Exhibit 2F, p. 8). This is supported by the only "slightly" constricted affect and depressed mood observed by the doctor during his examination, and is consistent with the generally benign moods and behaviors observed by the claimant's regular treating providers, as well as the only "mild" or "very mild" word-finding

34

> difficulties they found. The undersigned adopts the doctor's opinion as support for
> the finding that the claimant's mental impairments are no more than nonsevere.

(Tr. 14 (citing Tr. 1815).)

Given the ALJ's accurate description of Dr. Pickholtz's findings, and the consistency of

the "mild" and "slight" limitations he identified with a classification of the impairments as

nonsevere and causing no functional limitations, the record supports a finding that the ALJ's

reliance on this opinion in finding that the mental impairments were nonsevere is supported by

substantial evidence.  Ms. Roberts's argument that the ALJ failed to build an accurate and logical

bridge between Dr. Pickholtz's opinion and that determination is without merit.

### iii. Ms. Roberts' Activities of Daily Living

With respect to her final argument, Ms. Roberts contends that "the ALJ's citations to Ms.

Roberts's ability to carry out mundane activities of daily living is not sufficient rationale to

conclude that she has no severe mental impairments."  (ECF Doc. 17, p. 16.)   This argument is

without merit.  First, it is evident that the ALJ did not rely solely on Ms. Roberts's activities of

daily living to support her finding that the mental impairments were nonsevere.  She explicitly

considered and relied in part on Ms. Roberts' generally "mild" and "low average" findings on

mental status examination, Dr. Pickholtz's opinion that her impairments were no more than

"slight," and the ALJ's own observations of Ms. Roberts' ability to "speak at length about [her]

treatment and work history without any apparent difficulty remembering or understanding

details" and to "follow lines of questioning and respond with detailed answers" at her hearing.

(Tr. 14-15.)  The ALJ also noted that the state agency reviewing psychological consultants had

opined that Ms. Roberts had no severe psychological impairment. (Tr. 15.)  Second, it is noted

that the activities of daily living identified by the ALJ may well be characterized as more than

"mundane."  (*See* Tr. 14-15 (reporting activities that included caring for hygiene, socializing

with friends, completing household chores, watching television, using a computer for recreation, maintaining relationship with father she lived with, shopping in public stores, maintaining focus to drive a car and read books and news articles, administering her own medication, arranging her own schedule, and managing her own transportation).)

For all of the reasons stated above, Ms. Roberts has failed to establish that the ALJ lacked substantial evidence to support her findings that the mental impairments were nonsevere and did not cause functional limitations that must be addressed in the RFC

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

December 8, 2021

/s/ Amanda M. Knapp

_____

AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).